Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN A. OLAGUES and RAY WOLLNEY,<br><br>                    Plaintiffs,<br><br>vs.<br><br>ELON MUSK, JEFFREY B. STRAUBEL, ANTONIO J. GRACIAS, AND KIMBAL MUSK,<br><br>                    Defendants,<br><br>          -and-<br><br>TESLA, INC., a Delaware Corporation,<br><br>                    Nominal Defendant. | Case No.:<br><br>**COMPLAINT FOR VIOLATION OF SECTION 16(b) OF THE EXCHANGE ACT**<br><br><br>**JURY TRIAL DEMAND** |

Plaintiffs, allege, based upon knowledge with respect to the facts relating to themselves and upon information and belief with respect to all other allegations, as follows:

**INTRODUCTION**

1.      This action is brought pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") [15 U.S.C.  78p(b)] ("Section 16(b)"), in order to recover short-swing insider trading profits realized by Defendants while they were statutory insiders of Tesla, Inc., which does business in California as Tesla Motors, Inc. (hereinafter referred to as "Tesla").  They acquired the right to receive the challenged Tesla shares in connection with Tesla's acquisition of SolarCity Corporation ("SolarCity")(the "Acquisition").

2.      Section 16(b) of the Exchange Act requires company insiders to disgorge any profits earned by Section 16 (b) insiders through short-swing insider trading (i.e., non-exempt purchases and non-exempt sales, or non-exempt sales and non-exempt purchases of the company's equity securities, within less than a six month period). Actual misuse of inside information is not an element of the claim although the statute embodies a presumption that statutory insiders have access to such inside information.

**JURISDICTION AND VENUE**

3.      Jurisdiction in this Court arises under Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(3) as Tesla's principal place of business is in this District.

**PARTIES**

5.      Plaintiff John Olagues is a shareholder of Tesla.

6.      Plaintiff Ray Wollney is a shareholder of Tesla.

7.      Defendant Elon Musk ("Musk") was a founder and Chairman of the Board of Directors of SolarCity and at all relevant times was the Chairman and CEO of Tesla within the meaning of Section 16(b) of the Securities Exchange Act of 1934.

COMPLAINT FOR VIOLATION OF SECTION 16(b) OF THE EXCHANGE ACT

8.    Defendant Jeffrey B. Straubel ("Straubel") was a member of the Board of Directors of SolarCity and the Chief Technical Officer of Tesla.

9.    Defendant Antonio J. Gracias ("Gracias") was a member of the Board of Directors of SolarCity and a member of the Board of Directors of Tesla.

10.    Defendant Kimbal Musk ("Kimbal Musk") was a shareholder of SolarCity and a member of the Board of Directors of Tesla.

11.    Nominal Defendant Tesla is a Delaware corporation with its headquarters located at 3500 Deer Creek Road, Palo Alto, California 94304; and its vehicle manufacturing facility located at 45500 Fremont Blvd., Fremont, California 94538.

12.    Tesla's common stock is registered with the SEC pursuant to Section 12 of the Exchange Act and trades on the NASDAQ under the symbol TSLA.

13.    Plaintiffs sent letters dated August 29, 2018 to Tesla requesting that Tesla take appropriate steps to recover short swing profits from Defendants Musk and Straubel.  Plaintiffs sent letters dated September 10, 2018 to Tesla requesting that Tesla take appropriate steps to recover short swing profits from Defendants Gracias and Kimbal Musk.  On October 26, 2018, Tesla notified Plaintiffs that its Board had considered the requests and declined to take any steps to recover the short swing profits.  Plaintiffs sent a further request to Tesla on November 9, 2018.  In a November 15, 2018 conference call, Tesla advised Plaintiffs that its position had not changed and that it did not intend to take any steps to recover the short swing profits addressed in this Complaint.

## FACTUAL ALLEGATIONS

**The Transactions**

14.    Musk acquired the "right to receive" 2,403,024 shares of Tesla on November 21, 2016 for $185 per share in connection with the Tesla acquisition of SolarCity.  Musk sold 2,403,024 shares of Tesla on May 25, 2016 at $213.22 per share resulting in a recoverable profit.

15.     Straubel acquired the "right to receive" 83,407 shares of Tesla on November 21, 2016 for $185 per share in connection with the Tesla acquisition of SolarCity.  Straubel sold 83,407 shares of Tesla on May 8 and 9, 2017 for $308 per share resulting in a recoverable profit.

16.     Gracias acquired the "right to receive" 16,659 shares of Tesla on November 21, 2016 for $185 per share in connection with the Tesla acquisition of SolarCity.  Gracias sold (a) 5,460 shares of Tesla on February 24, 2017 for $255.90 per share, (b) 5,590 shares of Tesla on February 6, 2017 for $254.40 per share, and (c) 5,600 shares of Tesla on January 25, 2017 for $254.40 per share resulting in a recoverable profit.

17.     Kimbal Musk acquired the "right to receive" 16,150 shares of Tesla in connection with the acquisition of SolarCity at a price of $185 per share.  In a series of transactions from June 13, 2016 through May 1, 2017, Kimbal Musk sold 16,150 shares of Tesla for prices ranging from $197.60 per share to $315.70 per share resulting in a recoverable profit.

**The Tesla/Solar City Acquisition**

18.     This action involves a November 21, 2016 merger through which Tesla's D Subsidiary acquired SolarCity, which became a wholly owned subsidiary of Tesla.

19.     Tesla's stated reason for declining to recover short swing profits from Defendants is based on SEC Rule 16b-3(d)[17 CFR 240.16b-3(d)], which  provides an exemption to the penalties of Section 16(b) where the shares are acquired from the issuer in a transaction that is "approved by the board of directors of the issuer" or "approved or ratified, in compliance with section 14 of the Act, by . . . the affirmative votes of the holders of a majority of the securities of the issuer . . . entitled to vote . . . in accordance with the applicable laws of [Delaware]."

20.     For the reasons stated below, the vote of the Tesla Board to approve the Acquisition by which Defendants received the shares in question was not a valid vote and, likewise, the vote of the shareholders to approve the transaction was not a valid vote, so the exemptions of Rule 16b-3(d) do not apply.

21.     This action involves a November 21, 2016 merger through which Tesla's D Subsidiary acquired SolarCity, which became a wholly owned subsidiary of Tesla.

22.     SolarCity was a public corporation headquartered in San Mateo, California that was founded by Musk and his cousins, Peter and Lyndon Rive.

23.     Musk is Tesla's largest stockholder.  At the time of the Acquisition, Musk owned approximately 22.1% of Tesla's common stock.  He serves as the Chairman of the Tesla Board and as Tesla's CEO and Chief Product Architect, although pursuant to settlement of an SEC enforcement action, Musk is presently being replaced as Chairman.  He also led Tesla's pre-initial public offering ("IPO") funding rounds.  Tesla has acknowledged in its SEC filings that Musk is not an independent director.

24.     Musk also served as the Chairman of the SolarCity Board.  He was SolarCity's largest stockholder, holding approximately 21.9% of its common stock prior to the Acquisition.  As a result of the Acquisition, Musk's SolarCity holdings were converted to over $500 million of Tesla shares.  Musk has publicly maintained that Tesla, SolarCity and SpaceX form a "pyramid on top of which he sits, and that it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid . . . falters."

25.     At the time of the Acquisiton, Tesla's Board had seven members, Musk, Brad W. Buss, Robyn M. Denholm, Ira Ehrenpreis, Antonio J. Gracias, Stephen T. Jurvetson and Kimbal Musk.

26.     Buss was a Chief Financial Officer of SolarCity and worked as an employee or consultant of SolarCity through December 31, 2016, earning compensation of over $32 million.  Tesla's 2015 proxy statement acknowledges that Buss is not an independent director.

27.     Ehrenpreis is a managing partner and co-owner of the venture capital firm, DBL Partners, which he co-founded with fellow managing partner and co-owner Nancy Pfund.  Pfund was an observer on the Tesla Board from 2006 to 2010.  She was also a member of the SolarCity Board and one of two members of the SolarCity Board's special committee that negotiated and approved the Acquisition.  At the time of the Acquisition, Pfund beneficially owned 1,554,114 shares of SolarCity common stock.  She is a close friend of Musk's.

28.     Gracias is Tesla's Lead Independent Director and also a close friend of Musk.  Musk gave Gracias the second Tesla Roadster ever made.  Gracias served on SolarCity's Board

at the time of the Acquisition and beneficially owned 211,854 shares of SolarCity common stock.  He is also the founder and CEO of the private equity firm Valor Management Corp., which participated in several pre-IPO funding rounds for Tesla and SolarCity.  Musk invested $2 million in each of two Valor funds.

29.     Jurvetson is also close friends with Musk, who gave Jurvetson the first Tesla Model S and the second Tesla Model X ever made.  Jurvetson owned 417,450 shares of SolarCity common stock at the time of the Acquisition.  Jurvetson's venture capital firm, Draper Fisher Jurvetson ("DFJ") invested in both Tesla and SolarCity.  At the time of the Acquisition, funds managed by DFJ beneficially owned 3,308,266 shares of SolarCity common stock.  Musk invests in DFJ and one of Musk's trusts is a limited partner in a DFJ fund.

30.     Kimbal Musk is Musk's brother and cousin of Lyndon and Peter Rive, SolarCity's co-founders.  Tesla's SEC filings acknowledge that Kimbal Musk is not an independent director.  At the time of the Acquisition, Kimbal also beneficially owned 147,541 shares of SolarCity common stock.  Kimbal Musk is also a limited partner in two Valor funds.

31.     At the time of the Acquisition, SolarCity faced significant liquidity concerns.  Its stock had declined approximately 64% in value between February 2015 and February 2016. SolarCity had substantial debt and had attempted to raise capital through bond offerings.  It was also sued for misappropriating trade secrets and intellectual property with regard to its solar cell shingling technology, which Musk had declared to be the driver of the value any synergies in the Acquisition.

32.     Musk repeatedly presented the Tesla Board with proposals for acquiring SolarCity.  The Board considered these requests without ever looking at other more valuable opportunities available in the market.

33.     Tesla announced its offer to purchase SolarCity on June 21, 2016 in a transaction that was proposed by and was being driven by Musk.  On July 20, 2016, Musk published a statement on Tesla's website which reflected that the Acquisition was being driven by Musk, as it has been a component of his strategy for Tesla for at least 10 years.

COMPLAINT FOR VIOLATION OF SECTION 16(b) OF THE EXCHANGE ACT

34.     In July and August 2016, SolarCity was at high risk of default on its Revolver loan.  Musk, and his cousins Lyndon and Peter Rive, responded by acquiring $100 million of SolarCity bonds.  It was also learned that SolarCity's Buffalo, NY factory was behind schedule, over budget, and at risk of losing the incentives provided for locating its factory there.

35.     On August 1, 2016 Tesla and SolarCity announced the Merger Agreement, pursuant to which Tesla would acquire SolarCity in an all-stock deal.  The Merger Agreement provided for each share of SolarCity common stock to be converted into "the right to receive" 0.110 shares of Tesla common stock.  The Acquisition was a bailout of SolarCity that benefitted six of the seven members of the Tesla Board or their family members, businesses and business partners.

36.     In the Acquisition, all outstanding Shares of SolarCity, including those owned by officers or directors of SolarCity were then disposed of to SolarCity as indicated on the SEC Form 4 of November 21, 2016. SolarCity then converted those shares into the "right to receive" Tesla shares.

37.     The Tesla Board's vote to approve the Acquisition was not a valid approval of the transaction because of Musk's control over the Tesla Board.  Musk held 22.1% of the Tesla stock and he had demonstrated a willingness to oust senior management who displeased him, as he did with founder and former CEO Eberhard.  Musk was the public face of Tesla and no steps were taken to separate Musk from the Board's consideration of the Acquisition.  The Board never considered forming a committee of disinterested, independent directors to consider the Acquisition, notwithstanding the obvious conflicts its members held.  Accordingly, the vote of the Board to approve the Acquisition constituted a breach of fiduciary duty owed to Tesla by those Board members.

38.     The combination of Musk's voting influence, his domination of the Board during the process leading up to the Acquisition, along with his extraordinary influence within the company generally, the conflicts at the Board level that diminished the Board's resistance to Musk's influence, and Tesla's and Musk's own acknowledgements of his level of influence establish Musk's status as a controlling stockholder.

39.     The vote of the Tesla stockholders to approve the Acquisition was also invalid as a result of a proxy statement that failed to disclose the conflicts among the Board, Musk's degree of control over the vote of the Board with regard to the transaction in which he was an interested party, and other information relevant to the Acquisition.  Additionally, institutional stockholders who held equity positions in both Tesla and SolarCity should have been excluded from the vote tally for purposes of assessing the results and effect of a disinterested vote. Tesla's top 25 institutional stockholders holding 45.7% of Tesla's stock also held SolarCity stock at the time of the Acquisition.

**The Transaction between Defendants and SolarCity were not Exempt because SolarCity was not the Issuer of the shares that Defendant Initially Obtained the Right to Receive**

40.     An alternative reason that the claimed exemption does not apply is that in this series of transactions, the issuer was Tesla but the initial transactions were between SolarCity and Defendants, who were insiders of both SolarCity and Tesla, as stated on the November 23, 2016 SEC Forms 4 for the transactions on November 21, 2016.

41.     According to the Merger Agreement, and from Tesla and SolarCity Forms 8-K and Schedules 13D and from the statements on the SEC Forms 4, prior to November 21, 2016, the D subsidiary was created by Tesla and at the "Effective Time" on November 21, 2016, SolarCity was merged with the D subsidiary, with SolarCity the surviving wholly owned subsidiary of Tesla.

42.     According to the Merger Agreement and the Forms 8-K and Schedules 13D filed by Tesla and SolarCity, all SolarCity shares were converted into "the right to receive" Tesla shares.

43.     According to the SEC Form 4 filing SolarCity is the issuer and Musk was a Director and 10% owner of SolarCity. This SEC Form 4 indicates that Musk in a transaction with SolarCity disposed of 21,845,674 shares of SolarCity to SolarCity. SolarCity then converted the 21,845,674 SolarCity Corp shares into the right to receive 2,403,024 shares of Tesla, with Musk acquiring "the right to receive" 2,403,024 shares of Tesla.  The same

1   disclosures and series of transactions, albeit with different numbers of shares, was made for

2   each of the Defendants other than Musk.

3       44.    There are no separate SEC Forms 4 filed by Defendants that indicate the

4   "acquisition of the right to receive" the shares of Tesla stock (i.e. defined as a "purchase" in 15

5   U.S.C. 78c(a)(13).

6       45.    Nothing in the Merger Agreement or the Forms 8-K or the Schedules 13D filed

7   by Tesla or SolarCity indicates a purchase transaction between Tesla and Defendants of Tesla

8   shares.

9       46.    An SEC Form 4 filed on November 21, 2016  on behalf of  Musk indicates that

10  there was an acquisition of 2,403,024 shares of Tesla shares pursuant to Rule 16b-3(d) by Musk,

11  indicated by an entry of "A" into Column 3 of Table 1 of the SEC Form 4. This SEC Form 4

12  was filed notwithstanding the fact that there was no such transaction indicated in the Merger

13  Agreement or the Forms 8-K or Schedules 13D of Tesla or SolarCity.

14      47.    Therefore the challenged transactions were not between insiders and the issuer

15  Tesla. Thus the challenged transactions are non exempt purchases for Section 16(b) matching.

16                              **COUNT I**

17              **(Violations of Section 16(b) of the Exchange Act)**

18      48.    Plaintiffs reallege and incorporate herein all allegations in the preceding

19  paragraphs.

20      49.    Defendants profited by their purchase and sale of Tesla stock by engaging in

21  such transactions within a six month period.  Defendants' challenged transactions violated

22  Section 16(b) of the Exchange Act.

23      50.    Defendants must disgorge all profits from short-swing transactions to Tesla, in an

24  amount to be proven at trial.

25      WHEREFORE, Plaintiff demands judgment of Defendants as follows:

26      1.     For recovery to Tesla from Defendants of all profits resulting from their short

27  swing transactions in Tesla equity securities in violation of Section 16(b) of the Securities

28  Exchange Act of 1934 in an amount to be proven at trial;

2.      For prejudgment and postjudgment interest on the amount of profits recovered, calculated from the time Defendants realized the profits;

3.      For Plaintiffs' attorneys fees and expenses; and,

4.      For such other and further relief as the Court deems just.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

DATED:  November 21, 2018                    **GREEN & NOBLIN, P.C.**

By:   /s/ Robert S. Green
              Robert S. Green

James Robert Noblin
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email:  gnecf@classcounsel.com

*Attorneys for Plaintiffs*

COMPLAINT FOR VIOLATION OF SECTION 16(b) OF THE EXCHANGE ACT

**VERIFICATION**

I, John A. Olagues, declare that I have reviewed this Verified Shareholder Derivative Complaint ("Complaint") and I authorize its filing.  The Complaint is true and correct to the best of my knowledge, information, and belief.  As to those allegations of which I have personal knowledge, I believe the allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel's investigation and believe those allegations to be true.  I am a holder of Tesla, Inc. common stock, and I was a holder of Tesla, Inc. common.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Nov 20, 2018
Date

John A. Olagues

## **VERIFICATION**

I, Ray Wollney, declare that I have reviewed this Complaint and I authorize its filing.  The Complaint is true and correct to the best of my knowledge, information, and belief.  As to those allegations of which I have personal knowledge, I believe the allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel's investigation and believe those allegations to be true.  I am a holder of Tesla, Inc. common stock.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date

Ray Wollney

1